45 So.2d 547 (1950)
MATTHEWS
v.
NEW ORLEANS TERMINAL CO. et al.
No. 19356.
Court of Appeal of Louisiana, Orleans.
March 27, 1950.
*549 James J. Morrison, New Orleans, for plaintiff and appellee.
Monroe & Lemann, New Orleans, Walter J. Suthon, Jr., New Orleans, of counsel, for defendants and appellants.
McBRIDE, Judge.
About 1 o'clock, a. m., on February 21, 1948, plaintiff's automobile was struck on its left side by a Diesel locomotive, at the intersection of Elysian Fields Avenue and the railroad tracks of New Orleans Terminal Company, located on the embankment alongside the Florida Avenue Canal in the City of New Orleans. This suit was instituted for $26,515.83 by plaintiff against New Orleans Terminal Company and New Orleans and Northeastern Railroad Company, the petition alleging that the locomotive was owned by both of said defendants.
Plaintiff charges, among other things, (1) that no bell or whistle signal was given by the engineer, (2) that the flasher-light signals placed by the railroad at the crossing were not operating and failed to give warning of the approach of the train, (3) that the headlight on the locomotive was not illuminated, (4) that the train was being operated at too fast a speed, and (5) that the engineer was incompetent. Alternatively, assuming the possibility of a finding of contributory negligence on plaintiff's part, recovery is sought upon the last clear chance doctrine.
Defendants denied negligence on the part of their employees, and charged that the accident was caused solely through the negligence of the plaintiff, and alternatively the plea is made that the plaintiff was guilty of contributory negligence barring a recovery. The answer denies that defendant, New Orleans and Northeastern Railroad Company, had any participation in the accident, and avers that the accident took place on a track of defendant, New Orleans Terminal Company, and that the railroad movement involved was a movement of said defendant.
A jury trial resulted in a 9-to-3 general verdict for plaintiff for $2,370.40, against New Orleans Terminal Company. Said defendant moved for a new trial, which was refused by the trial judge with written reasons, and thereupon said defendant prosecuted this appeal from the judgment on the jury's verdict. By way of answer to the appeal, plaintiff prays for an increase in the award to the full amount sued for.
In denying a new trial, the judge stated:
"I did not agree with the verdict of the Jury. If the case had been tried before me alone, I would have rendered a judgment in favor of the defendant. While I disagreed with the Jury's verdict, I did not regard the verdict so erroneous that it could not be corrected on appeal. I had no power to take the case from the Jury and render judgment in accordance with my own views. On the motion for a new trial, I could only order a retrial before another Jury, but I could see no useful purpose to be served by ordering a retrial."
"The record was made up as fully as either side desired to present its case, and there was no suggestion of any newly-discovered testimony in the matter and the award was not excessive. Any case that was contested as this one, was certain to be appealed, no matter which side prevailed at the trial. As the parties had full opportunity to make up their record, I concluded the case might as well go up on appeal upon the record as made up, in order to save time and expense, and to avoid the delay involved in a retrial at the next Jury Term, and eventually an appeal."
It is the duty of a trial court to see that justice is done between the litigants, and if, in a case tried before a jury, the judge believes that the verdict is unauthorized and unjust, he should grant a new trial, and the fact that such course may involve time and additional expense is an insufficient reason for his making a verdict, which in his opinion is not supported by the law and the evidence and will operate an injustice, the judgment of his court. C.P. arts. 521, 527, 541, 560; Act No. 51 of 1908; Burt et ux. v. Shreveport Ry. Co., 142 La. 308, 76 So. 723.
However, in a case where the trial court believes that the verdict of the jury is contrary to the law and the evidence, but refuses a new trial rather than remand the *550 case, it is the duty of the appellate court to pass a definitive judgment on the record before it, irrespective of whether the district judge was or was not correct in his refusal to grant the new trial. Aethans v. Toye Bros. Yellow Cab Co., La.App., 191 So. 717.
Plaintiff was driving on the right-hand roadway of Elysian Fields Avenue in the direction of the lake. Said avenue, which runs from the Mississippi River toward Lake Ponchartrain, has a neutral ground in its center 111 feet wide, with a paved roadway 24 feet wide on each side of the neutral ground to accommodate vehicular traffic. Florida Avenue crosses Elysian Fields Avenue at about a right angle. The distance from the river-side edge of the intersection of Elysian Fields Avenue with Florida Avenue, to the railroad track on which the accident happened, along the paved roadway upon which plaintiff was driving, is about 210 feet. Along Florida Avenue is a drainage canal, across which there is a bridge, and the distance between this bridge and the railroad tracks is about 130 feet.
The train, which consisted of a Diesel locomotive and thirteen freight cars attached, was proceeding in a downtown direction, i. e., crossing Elysian Fields Avenue, in a movement toward the Press Street yards. In other words, the train approached from plaintiff's left. The railroad, at this point, is double-tracked, and the tracks are on a slight elevation, and consequently there is a slight upgrade which must be traversed by an automobile crossing the tracks. The train movement was on the track nearer to the riverthe first track reached by the automobile.
The tracks curve moderately, but not sharply, as they come toward Elysian Fields Avenue, and the direction of the curve is such as to enable a motorist travelling in the direction as was plaintiff, to see the approaching train by looking to his left and ahead, and was not such as to necessitate a sidewise and backward glance in order to see whether a train was coming. All witnesses agree that there were no structures or other obstructions of such nature as to interfere with plaintiff's view of the train as it approached.
Although the petition alleges that the railroad employees were guilty of negligence in many respects, plaintiff's proof has fallen far short of making out a case. The only eyewitnesses to the accident besides plaintiff were the members of the train crew. Plaintiff's entire version of the accident is set forth in the following extract taken from his direct testimony: "As I approached Florida Avenue which crosses Elysian Fields, I passed a truck. I passed it on my left; the truck was on my right approximately about a half a block before I got to the tracks. So I approached the tracks; I looked in both directions, particularly to the left because there is not a slight bend there, but a rather large bend that would obscure your vision of an on-coming train if you were not careful. I slowed up before I got to the tracks and then started over, but before increasing my speed after slowing up at the grade, there is a grade there, I definitely looked for the signal lights located there, and there was no noise or undue traffic, and I am very positive there were no signal lights working, nor any bells ringing at that time. I attempted to cross the first line of tracks and had a very slight fraction of time before I was struck by the train. I could almost feel, before I could see, the impact of the train upon me. That covers about as far as I could remember. * * *"
At no time did plaintiff refer to the absence of the sound of bell or whistle signals emanating from the locomotive, nor did he make any allusion to the headlight of the locomotive.
On the other hand, members of the train crew testified that bell signals were given, and that the air horn of the Diesel engine was sounded while the train approached the crossing, and that the signals, both by means of the bell and the air horn, were given for other nearby crossings as well. They agreed also that the headlight on the locomotive was brightly illuminated. This testimony of the crew members, being absolutely uncontradicted, must be accepted as being true.
It clearly appears from Matthews testimony that before increasing the speed of the automobile after slowing at the upgrade, *551 his undivided attention was directed toward the flasher-light signals, which he insists were not in operation at the time and gave him no warning of the approach of the on-coming train.
Appellant concedes that the crossing in question, at the intersection of a railroad track and a paved street, is one which Ordinance No. 14,114, C.C.S., of the City of New Orleans, requires be protected by an automatic flasher signal light installed by the railroad. Appellant, at the time of the accident, admittedly had such an automatic signal device, which included an automatic bell, at the paved roadway on which plaintiff drove toward the lake, and that the signal device faced in the direction from which traffic on that roadway approached. The trainmen all testified that the signals were properly functioning.
No useful purpose whatever would be served by resolving the question whether the crossing signal lights were properly operated, or for that matter if they operated at all. However, assuming arguendo that the lights were not flashing, such fact of itself would not relieve plaintiff of the duty imposed upon him by law to stop, look, and listen for approaching trains, and by the exercise of prudence and vigilance to avoid placing himself in a position of imminent peril.
The pertinent principle of law is stated in Brown v. Texas & Pacific Ry. Co., 42 La.Ann. 350, 7 So. 682, 684, 21 Am.St. Rep. 374, thus: "Statutes and municipal ordinances in every jurisdiction prescribe specifically the duty of railway corporations in respect to railway crossings; but no failure on the part of the railroad company to do its duty will excuse any one from using the senses of sight and hearing upon approaching a railway crossing, and, whenever the due use of either sense would have enabled the injured person to escape the danger, the injury is conclusive evidence of negligence, without any reference to the railroad's failure to perform its duty." See also Tucker v. Illinois Central R. Co., 141 La. 1096, 76 So. 212, and the cases there cited.
See also Gibbens v. New Orleans Terminal Co., 159 La. 347, 105 So. 367, and Martin v. Yazoo & M. R. Co., La.App. 181 So. 571, wherein it was held that an open gate or the absence of a flagman at a crossing does not constitute an invitation to a motorist to proceed onto railroad tracks without first stopping, looking, and listening.
On cross-examination, the following testimony was elicited from plaintiff:
"Q. And you are positive that you looked particularly to the left as you were going up towards the tracks and you neither saw nor heard anything of an approaching train? A. I am very sure.
"Q. Did you ever come to a stop as you were going up there towards the tracks, or did you just slow down? A. I don't want to imply I stopped for 2 or 3 minutes, but I did stop and shift gears.
"Q. You did stop and shift gears? A. Yes, sir.
"Q. Where was that; before you reached the bridge? A. Slightly before the bridge.
"Q. Before the bridge? A. Yes, sir.
"Q. And then you went on forward without stopping again? A. Yes, sir.

* * * * * *
"Q. Now, how close to the track were you when you first realized that the train was coming? A. I was on the tracks before I realized it was on top of me."
The point referred to by plaintiff, at which he says he stopped and shifted gears, was at least 160 feet from the crossing, and a stop with an observation at such a remote point can hardly be said to be such a precaution as would have been a stop and observation made nearer to the tracks.
It was said by the Supreme Court, in Young v. Louisiana Western R. Co., 153 La. 129, 95 So. 511, 512, that: "The duty to stop, look, and listen must be performed at a time and place where stopping, looking and listening will be effective."
If Matthews looked in both directions, as he maintains he did, the observation took place when he stopped and shifted gears, just before reaching the bridge spanning the canal, and taking his testimony to mean that he maintained a constant lookout for trains as he drove toward the tracks after stopping and shifting gears, we can perceive *552 of no reason whatever why he should not, by the exercise of his senses of sight and hearing, have become cognizant of the approach of the train.
The record is barren of any testimony showing at what rate of speed plaintiff travelled from the bridge to the upgrade, or to what extent he retarded the momentum of his car upon arriving at the upgrade. Whether Matthews had his vehicle under such control that he could stop immediately if danger confronted him, is a question that cannot be determined from the record.
The law makes it the duty of a motorist to stop before traversing a railroad track, but that rule is not to be so rigorously construed as to require a position of absolute immobility, and it will suffice for such person to have the motion of his vehicle so retarded and under such control that he can stop instantly if need be, provided, however, he exercises due care in looking and listening for an approaching train. Another step is also necessary. He must see that which may be seen, and hear that which may be heard, and he is held to have seen that which he could have and should have seen. Slayter v. Texas & P. R. Co., La.App., 182 So. 343; Gibbens v. New Orleans Terminal Co., supra; Aymond v. Western Union Telegraph Co., 151 La. 184, 91 So. 671; Robertson v. Missouri Pacific R. Co., La. App., 165 So. 527.
What was said by the Supreme Court, in Perrin v. New Orleans Terminal Co., 140 La. 818, 74 So. 160, 162, is appropriate to the instant case: "It is not possible for plaintiff to have taken the care which he says he took on the day of the accident, and yet to have been struck by the train of the defendant. * * *"
Likewise appropriate is the language used by the court in Henderson v. Missouri Pac. R. Co., 15 La.App. 196, 131 So. 586, 587: "* * * Therefore, the fact that plaintiff did not see the train until the automobile got up on the track is proof sufficient that he did not look for it until then."
Plaintiff's own recital of his approach to and the ill-timed attempt to cross the railroad tracks, convinces us absolutely that he did not in the least take those precautionary steps which the law expected of him and which common sense and prudence dictated were proper under the circumstances prevailing at the crossing.
It is elementary that where the negligence of a claimant for damages contributed to the accident, he should be denied a recovery, irrespective of the fault of the other party, and since we have reached the conclusion that the proximate cause of the collision was plaintiff's own negligence, there is no necessity for passing upon the question of primary negligence on the part of the employees of appellant's railroad.
Left only for determination then is whether the operator of the locomotive had the last clear chance and opportunity of avoiding a collision with Matthews' car.
Plaintiff, in arguing the applicability of the doctrine, maintains that the locomotive was not timely stopped because it was in charge and under control of an incompetent and inexperienced operator.
The locomotive was being driven by the fireman, Flores, a young man who was at the time twenty-five years of age. He entered the service of the railroad during 1941, and after nineteen months of that service he entered the Army and remained in military service for about thirty months, during practically all of which time he worked in military railroad duty as fireman and engineer. He resumed employment with appellant in 1946, and about one year later qualified as an engineer. Since such qualification, he has worked in the capacity of an engineer whenever that position was open to one of his seniority, as much as several times in each month. When serving as fireman in a train crew, he oftimes takes the engineer's post, which he had done at the time of the accident, in the place of Salaun, the regular engineer, who was riding with him in the cab of the engine. Nothing appears in the record which could possibly lead to a finding that Flores was an inexperienced or incompetent engineer. We are unaware of any legal disqualification or presumption of incompetency attaching to a person of his *553 age functioning at the throttle of a locomotive.
It is conceded that the train was moving at a speed of about fifteen miles an hour, which certainly cannot be said to be excessive. It appears that the brakes on the train were in good working condition and functioned properly when applied upon the occasion of the accident. The train was brought to a stop about 100 feet after striking the automobile.
An analysis of all of Flores' testimony reflects that he saw the automobile (identifying it to be such by its headlights) approaching at about thirty miles an hour, at a considerable distance away from the tracks, when the locomotive had reached about 100 feet before coming to the first paved roadway of Elysian Fields Avenue, or about 230 feet from the point of impact, and that he expected the automobile to stop before going upon the tracks.
When the train was at about the middle of the neutral ground, some sixty feet from the crossing, Flores then realized that the automobile was not going to stop, and he immediately applied the emergency brake, but the stopping distance was too limited, and the collision ensued. Flores stated that when an automobile is observed approaching the tracks, an engineer cannot determine whether the driver will stop for the crossing, until the car has reached close proximity to the tracks and the driver's intention becomes manifest.
Counsel for appellee introduced into the evidence a statement made by Flores to the police officers a few hours after the accident, and points to that part of the statement which reads: "* * * I noticed an automobile traveling on Elysian Fields going towards Gentilly and I noticed that this automobile was not going to stop and I immediately applied the brakes of the train, * * *".
Counsel argues that when Flores first saw the automobile, the train was 235 feet or more from the paved roadway on which the Matthews car was moving, contending that according to the statement Flores knew at that time that it was not the intention of the driver of the automobile to stop for the crossing, and that Flores was under the duty of then immediately applying his emergency brakes.
It seems to us that counsel attempts to place a strained construction on the above-quoted portion of the operator's statement, and the import which we gather from the language does not coincide with counsel's opinion as to what Flores meant.
Such a situation has been discussed by the courts on several occasions. In Levy v. New Orleans & Northeastern R. Co., La.App., 20 So.2d 559, 565, appears the following comment: "* * * The crew sees many automobiles driving towards the crossing and they assume, as they are justified in doing, that each car is going to stop. See Cook v. Louisiana & N. W. R. Co., 130 La. 917, 58 So. 767; Guillot v. Louisiana Rwy. & Navigation Co., 3 La.App. 541; Perry v. Louisiana & Ark. Rwy. Co., La.App., 142 So. 736. Those in charge of a train are not required to bring it to a stop unless there is reason to believe that the driver of the approaching car is oblivious of the on-coming train. * * *"
It is a well-known fact that an automobile can be stopped more quickly than a train, and the ascending grade to the tracks, which Matthews had to traverse, could have facilitated an immediate stop of his automobile at the base of the grade, had the car been under proper control and its speed moderated to the proper extent.
Respecting the doctrine of last clear chance, the situation in the instant case is similar in point of fact to that which prevailed in the case of Levy v. New Orleans & Northeastern R. Co., supra, in which application of the doctrine was rejected by the court in the following language: "* * * The last clear chance here rested not in the crew of the train but in Mrs. Levy for it is made very clear that after the locomotive reached a point so near to the crossing that it could not be stopped there yet remained time for her to stop her automobile had she been aware of the danger as she should have been. Therefore, because of the contributory negligence of Mrs. Levy *554 there can be no recovery by plaintiff for her death."
In Eggleston v. Louisiana & A. Ry. Co., La.App., 192 So. 774, 780, is to be found the following language: "* * * Can it be said, however, that the engineer could and should have discovered the perilous situation earlier and when a sufficient distance away to prevent the accident through appropriate application of the brakes? We think not. The statutory law and jurisprudence of this state require that ordinarily a motorist give heed to a train approaching on a railroad crossing. In view of this requirement and as the train involved was plainly visible to the occupants of the Pontiac sedan and they were properly warned of its oncoming, the engineer was entitled to assume, when at least four seconds from the point of contact, that said automobile would come to a stop and not rush into the path of travel. * * *"
The situation existing here is comparable to that which existed in Young v. Louisiana Western R. Co., supra, wherein appears the statement [153 La. 129, 95 So. 512]: "The last chance doctrine has no application when the negligence of both parties was concurrent and continuous, down to the moment of the accident. Callery v. Morgan's La. & T. R. & S. S. Co., 139 La. [763], 770, 72 So. 222; Wolf v. New Orleans Ry. & Light Co., 133 La. 891, 63 So. 392; Castile v. O'Keefe, 138 La. 479, 70 So. 481."
The two authorities cited by appellee and contended as being controlling, Russo v. Texas & P. Ry. Co., 189 La. 1042, 181 So. 485, and Browne v. Texas & P. Ry. Co., La.App., 193 So. 511, are not apposite to the instant case. In each of the cited cases, a pedestrian, and not a motor vehicle, was struck by the train, and the court, in both instances, was of the opinion that the close proximity of the pedestrian to the tracks, and his posture and movements, were sufficient to indicate to the average mind that he was unaware and unmindful of the train's approach, and that the engineer should have acted and responded accordingly.
Appellee's counsel vigorously contends that the court should not disturb a jury verdict on what is predominantly a question of fact, arguing that nothing in the record indicates that the verdict is arbitrary or insupportable by the evidence.
The court, in Pouncy v. Temple, La.App., 41 So.2d 139, 141, discussed the scope of appellate review of jury cases involving questions of fact, as follows: "As above observed plaintiff requested and was granted a trial by jury which found for the defendants. Plaintiff zealously urges that this Court refrain from according any considerable weight to the findings of the jury. It is our view that the same weight, no more and no less, should be given the findings of a jury on questions of fact as is accorded those of a trial Judge. The findings of fact evidenced by the verdict of a jury should be carefully scrutinized and examined on appeal but should not be disturbed except in instances of manifest error. It is the province and obligation of this Court to carefully examine the facts as well as the law, * * *."
Other cases in which will be found like holdings are: Fontenelle v. Waguespack, 150 La. 316, 90 So. 662; Thrash v. Continental Casualty Co., La.App., 6 So.2d 75; Hill v. Louisiana Coca-Cola Bottling Co., La.App., 170 So. 45; Cimo v. Karstendiek, La.App., 173 So. 348; Despommier v. Louisville & Nashville R. Co., 8 Orleans App. 157; and Mire v. Yazoo & M. V. R. Co., 4 Orleans App. 256.
After a careful study of the case, we readily agree with the opinion of the trial judge, that the verdict of the jury should have been in favor of the railroad. The fact that the jury was divided (three members thereof having disagreed with the findings of the majority) is also a persuasive factor in the present case. However loath an appellate court may be to disturb findings of fact made by a jury, it is nevertheless, under the system of procedure obtaining in Louisiana in civil cases, the court's duty to render such judgment as the record warrants, which should have been rendered by the trial court in the first instance, *555 whether the case turns upon an issue of fact or of law. Hebert v. N. O. Public Service, Inc., 10 La.App. 341, 119 So. 575.
In Anderson v. Texas & P. Ry. Co., 139 La. 1104, 72 So. 751, 752, we find these expressions: "After all the facts of this case are considered, the mind is left in a condition of uncertainty fatal to plaintiff's case. Such, too, is the impression which the learned trial judge had of the case, who refused a new trial simply because he thought the case had better be left to come at once to this court. * * *"
Therefore, holding that the judgment appealed from is manifestly erroneous and contrary both to the weight of the evidence and to the law controlling the case,
We order, adjudge, and decree that the judgment be reversed, and that plaintiff's suit be dismissed at his cost.
Reversed.
REGAN, J., concurs.